## CHARGE TO THE GRAND JURY DELIVERED May 15, 1917.

Gentlemen of the Grand Jury:

You have the power to proceed in the way that a grand jury ordinarily does in regard to crimes against the United States. I have already charged as to those, and will not go over that ground. I think the probability is that most of the ordinary offenses against the postoffice and customs, etc., have already been attended to and will not engage your attention. Of course you are better judges than I am of that.

What is wanted of a grand jury at the present time and for the future relates more especially to something else, and it grows out of the circumstances in which we find ourselves. There are two or three things I want to call to your attention.

In the first place we know unfortunately that our country is at war, and we have living among us men, many of whom personally we esteem very highly, but who are alien enemies. Anything that they do in the way of a breach of their duties as alien enemies residing in the United States will have to be attended to

by the civil authorities. I do not know and I hope there will be nothing to be done on that score; still if any cases of that kind are brought to your attention by officers or by the district attorney during this term, it will be your duty to investigate them and to take proper steps. We know that there are laws being adopted at present on that subject. Possibly there is nothing I can charge you in particular as to that at present, but I simply want to call your attention to it as something that may be important. Any breaches of duty by citizens of the United States to their country when she is at war are to be taken cognizance of and to be punished also. That is another subject which will come up more fully later.

There is one thing that has impressed us all I am sure. During the prevalence of this World War,—I do not know any other name to give it,—we have noticed in the states and we have noticed here a gradual increase in the cost of practically everything, especially the necessities of life. Now, that may be perfectly normal. It may be perfectly proper. It is to be expected of course that where millions of men are taken out of the productive industries and are transferred into the destructive industries, because that is just what it is, taking them from the fields and workshops and putting them into other fields to shoot and kill each other, that must bring about a great change in industrial conditions. That we cannot avoid. That we have to pay for. But we know human nature well enough, and if we stop and look at our own hearts we find that it measurably applies to all of us, that the disposition is to turn an honest penny or one we may suppose to be honest, when opportunity offers. Now the experience of mankind,—I will not say of Adam, because he had no competitors,—but of everybody since his generation, is to take.

Charge to Grand Jury.

advantage of circumstances; and if one can get property at one price and sell it at another, it is only human nature to do it. Within bounds that is perfectly proper. It is what we are in business for, to buy low and sell higher and live on the profits. That is all right, but in times like these there are people who take advantage of the situation unduly, and that is what we have to look at. That is what governments are for. At the same time we cannot investigate everything, we perhaps have no right to investigate everything. Now back yonder among our English ancestors,—most of us are English originally,—there were three or four things that attracted their attention, at what was called "common law" before there was any statute on the subject. There were three very simple things. One was this, a person having some means would try to buy up all supplies; we have a word for it nowadays,—monopolies. Of course civilization was simpler then, but the principle was the same. A man would try to buy up everything in sight that he thought the people would need; particularly in the way of food and in the way of other supplies. That was called "engrossing," an old word which meant getting a large quantity of things. That was wrong and at common law it was illegal. The price could not be recovered and the person who did that was put in jail. That is good law now. Another was called "forestalling," and that was where a man would go to the gate of the city,—just as when San Juan was walled in at one time,—or go a little way out in the country, and stop the market wagons, and buy up what was being brought to market and might be retailed. That was called "forestalling." The word is being used now very commonly in another sense, but with the same idea. That was illegal and could be punished. Another scheme was circulating rumors with the idea of increas-

ing the price of what one had to sell. That occurs we know almost daily on the stock market, especially in war times. That was called regrating. Those three things are common-law offenses, and the principle of them applies just as much now as it did back there. We have had legislation by Congress, and we have had state legislation, but of course the state legislation does not affect us here. I will not go into the details of this legislation, because it would be confusing, but I can give you the principles of it.

There are posibly four things that have been aimed at by this legislation of Congress. It applies to clothing, it applies to food, it applies to supplies of all sorts, it applies beyond that even. One thing is the subject of monopoly. That you can see is that old English common-law matter that I spoke of called "engrossing." A monopoly is where anybody or any association of people get together and make an arrangement to control an article, and it does not make any difference what that arrangement is. It can be a pool, where people put all they have in one lot, or they can call it a trust, where it assumes the shape of a corporation or an institution that in form is legal, or it may be a gentleman's agreement, if you wish. It may be anything,—the form is immaterial. The law pays no attention to form. It gets at the substance. Whatever has for its object, and directly tends towards putting, the control of the necessities of life or supplies that we all need in one hand, is a monopoly, and is contrary to law.

Another thing is where people get together, manufacturers or anybody, it makes no difference who, with the idea of suppressing competition. It might be two grocery stores. It might be two hardware stores. It might cover one town or it might cover

the United States.  Where people get together and make a com-
bination of prices, limitation of output, division of territory, or
anything else with a view of suppressing competition, it is ille-
gal.  The contract is illegal, and what is done under it can be
punished by law.

Another is where competition is allowed,—but here is the
other side of it,—where competition remains, but unfair meth-
ods are used to get at the competition and injure competitors.
That also is forbidden by law.

Now I should mention three or four statutes which are the
main laws on the subject.  The principal one is that called the
"Sherman Anti-Trust Law of July 2, 1890," and as that is the
foundation of them all I am going to read that to you.  It is very
short, and let me say this.  Porto Rico, as we all know, is in a
peculiar position with regard to the United.States.  The court
has under consideration right now the technical relation, wheth-
er it is an incorporated territory or whether it is not an incor-
porated territory.  I do not pass on it here, but that is just an
instance, to show you the difficulty in applying our laws, how
far they apply here and how far they do not; Porto Rico is cer-
tainly for most purposes a territory of the United States, so that
a law that is passed by Congress applies here.  Now a law that
is passed by Congress does not always apply in my state of Ala-
bama or the district attorney's state of Virginia or anybody
else's state of New York.  Congress has only limited jurisdic-
tion when it comes to states, but when it comes to territories like
this, whatever the kind of territory, the jurisdiction of Congress
is complete, and whatever law Congress passes is good here and
has to be enforced here.  So, that is simple.  I think we can rely
upon that.  Now there are some little variations of this growing

Charge to Grand Jury.

out of the technicality of some of the law that we need not take up at all. What you are to do is to find an indictment in a proper case, and if the ingenuity of the lawyer for the accused can convince me that the particular law does not apply here or does not apply to that particular case, that is a matter to be threshed out in that particular case before the petit jury, but need not trouble you here. If there is reasonable ground to believe, from the evidence before you, that any Anti-Trust Law has been violated here, it is your duty to find an indictment. You can rely upon it that the lawyer for the defendant will take care of any doubtful points. The basis is this Anti-Trust Law proposed by Senator Sherman, and it goes way back to July 2, 1890. I will read all of it, not that I expect you to remember all of it by any means, but you can get the general idea from it and recollect that it applies here. (The court then read the law in question to the jury.)

I have read the whole Sherman Act. Of course the civil remedies you have nothing to do with. This is just to show you the scope of legislation of Congress. I want to give you an idea of how far Congress has gone and will go on this general subject. There have been several acts since that time. Even before then the Interstate Commerce Act provided for a number of offenses as between common carriers. That was in 1887. Then came this Sherman Act of 1890, and then in 1906 came the Hepburn Act, prohibiting certain arrangements between railroads, and before that the Wilson Tariff Act of 1894. There are certain provisions in that as to restraint of trade, when products are brought into the United States from foreign countries, which are still in force. And the last great act is what is called the Clay-

ton Act of October 15, 1914, which amends the Sherman Act
and makes almost every provision more drastic than before.

As you know from general information, persons who have been
affected by these different laws as to monopoly, as to restraint
of trade, as to prices, etc., have not sat still. They have resisted
the application of these laws. The result is that there have been
a number of cases,—their number is legion,—principally in the
courts of the United States, either to prevent the enforcement of
the law or to defend a case after it is brought, I could spend the
day telling you about these different cases, but it would simply
confuse you. I might give you the names of some just in passing.
The Trans-Missouri Freight Asso. Case, 166 U. S. 290, 41 L. ed.
1007, 17 Sup. Ct. Rep. 540, in 1897 went to the United States
Supreme Court. The Addyston Case, 175 U. S. 211, 44 L. ed.
136, 20 Sup. Ct. Rep. 96, in 1899, as to a combination of people
making iron pipes, gas pipes, etc., dividing up the territory of
the United States. That was declared illegal. The Northern
Securities Case, 193 U. S. 197, 48 L. ed. 679, 24 Sup. Ct. Rep.
436, in 1904, which had to do with the question whether the
Northern Pacific and other roads could put their stock and their
securities in a holding company which would vote in the differ-
ent corporations as the combination might wish, resulting in an
enormous trust. That was declared illegal. Then more recently
came in 1911 the Standard Oil Case, 221 U. S. 1, 55 L. ed. 619,
34 L.R.A.(N.S.) 834, 31 Sup. Ct. Rep. 502, Ann. Cas. 1912D,
734, and Tobacco Trust Case, 221 U. S. 106, 55 L. ed. 663, 31
Sup. Ct. Rep. 632, which in some respects institute a different
line of decisions. The general point of the law and the general
trend of these cases is this,—that under the Sherman Law any
restraint of trade is illegal, any combination in restraint of

trade. And I charge you, gentlemen, that it does not make any difference whether they are two big corporations or two little corporations or two persons,—it would have to be of course two or more,—whether out in the country, in town, or wherever it may be. Any combination in restraint of trade is illegal, that is to say, when that is going to make you or me or anybody else pay more than is fair for the articles. It applies to steamship companies and to railroad companies. It applies everywhere. There is no exemption from this law.

One modification by the courts, the Supreme Court of the United States, in these later cases, is this. In the Standard Oil Cases and in the Tobacco Co. Case in 1911 the Supreme Court has declared that the law is to be interpreted in a reasonable manner. They have used the expression, "apply the Rule of Reason." Chief Justice White was the author of that expression. The point is that grand juries and the courts are not to run amuck. They are not to be hunting up any agreement of people just because it is an agreement that happens to affect trade, and for that find an indictment. The law does not go that far. It is simply this,—that any agreement between two or more persons or two or more corporations intending and resulting in a restraint of trade or increase of prices which would not otherwise occur, which increase in prices or restraint of trade is unfair to the public, is forbidden. Any agreement that does not actually restrain trade is all right.

Each case has to be tried upon its merits, and it is difficult to define the line any more definitely than to say that you have to apply the rule of reason, not draw the distinction that you saw in the papers some days ago, a statement that some trusts are good trusts and some trusts are bad trusts. Not that, but any

agreement in restraint of trade which would not occur in the natural course of business is illegal. All that would be due to other causes or do not actually cause restraint are proper. You have to pass upon the difference between the two classes of cases.

I do not know what will be brought before you. That is the difficulty of the judge. If the judge should confer with the United States Attorney or with the United States Commissioner to find out what is going on to be brought before the grand jury the judge would receive impressions as to the cases to be brought up, and would have difficulty in proceeding in a fair manner, or he might influence the conduct of the case. That would be wrong. So the judge should not know, and I do not know, what will be brought before you. If you get to investigating a line of cases, and any question arises that you would like further light on from the court, I will give it to you. I do not mean that I know all the law. If I knew all the law there would be no use of having a lawyer on each side of the case to instruct me, or confuse me, as the case may be; but it is my duty to find out the law when any case comes up. So, if any matter comes before you as to which you would like fuller instructions, I will tell you the law. Transportation being vital to trade, it is quite possible I may have occasion to charge you further as to railroads and shipping under the recent legislation. The Interstate Commerce Act, however, has not applied here since March 2, 1917.

That is substantially what I want to say. You see it is very general, but I think it will give you an idea of what is to come before you. I think we all agree, from watching public affairs, that Congress during the past two or three years has been passing some very important laws. We may or may not approve of them. That is immaterial. The laws have been passed, and

Charge to Grand Jury.

right now there are before Congress other very important laws. It may very well be that some will be passed in a few days. But as they come up your attention will be called to them, and I will give you any additional charges that are called for. The district attorney will advise you, but there may be something that you will want further instructions about.

I think you can see, gentlemen, that this grand jury is called upon to take into account some things which have never been brought before a grand jury in Porto Rico before, and it is due to the changed circumstances politically and socially, and to the fact that we are all American citizens and are all interested in enforcing American law. We are part of one great country, and you are just as much interested as I am. Anybody who, up to March 2, called himself a Porto Rican and now calls himself an American, is just as much interested now as any other member of the grand jury. I think we will find, if we investigate, that Congress is taking no step backwards. As the war is one to "make the world safe for democracy," the social trend of our day is to remove obstacles from the business of the average man, those whom Lincoln called the common people. Congress is legislating more and more as to business relations with the intent of protecting the people against combinations and trusts, and everything else which would be in restrain of trade or of other rights of American citizens. Every year the work of the grand jury, I am satisfied, will be more important for this community.

You may now retire, gentlemen.